UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


NAYAKIA JACKSON,

                Plaintiff,                                      Hon. Ellen S.  Carmody

v.

                                                Case No. 1:10-cv-1163

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.

_____/


## OPINION

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim

for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  On March 14,

2011, the parties agreed to proceed in this Court for all further proceedings, including an order of

final judgment.  (Dkt. #9).

        Section 405(g) limits the Court to a review of the administrative record and provides

that if the Commissioner's decision is supported by substantial evidence it shall be conclusive.  The

Commissioner has found that Plaintiff is not disabled within the meaning of the Act.  For the reasons

stated below, the Court concludes that the Commissioner's decision is supported by substantial

evidence.  Accordingly, the Commissioner's decision is **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## **PROCEDURAL POSTURE**

Plaintiff was 32 years old at the time of the ALJ's decision. (Tr. 33, 143). She successfully completed high school and worked previously as a bus driver, general office clerk/receptionist, and production assembler. (Tr. 32, 154, 713).

Plaintiff applied for benefits on January 3, 2005, alleging that she had been disabled since June 2, 2004, due to "back, headaches, [and] depression." (Tr. 143-45, 162). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 51-142). On October 16, 2007, Plaintiff appeared before ALJ John Mondi, with testimony being offered by Plaintiff and vocational expert, Richard Riedl. (Tr. 669-707). In a written decision dated January 25, 2008, the ALJ determined that Plaintiff was not disabled. (Tr. 40-47). On June 26, 2008, the Appeals Council remanded the matter for further consideration. (Tr. 34-36).

On February 5, 2009, Plaintiff appeared before ALJ Paul Jones, with testimony being offered by Plaintiff and vocational expert, David Holwerda. (Tr. 708-62). In a written decision dated June 22, 2009, the ALJ determined that Plaintiff was not disabled. (Tr. 46-55). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 5-8). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g),

seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on September 30, 2008. (Tr. 21). To be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that she became disabled prior to the expiration of her insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## RELEVANT MEDICAL HISTORY

On February 8, 2002, Plaintiff was involved in a motor vehicle accident in which she was riding as a passenger in a car which was struck on the driver's side. (Tr. 303). She subsequently began experiencing headaches and pain in her neck, shoulder and upper back. (Tr. 303).

X-rays of Plaintiff's cervical spine, taken on March 19, 2002, were "normal" with "no evidence of injury or intrinsic disease." (Tr. 325). On November 8, 2002, Plaintiff participated in an MRI examination of her cervical spine the results of which revealed "moderate central stenosis and mild impression on the cord from broad-based central disc protrusion at C5-6." (Tr. 290-91). On December 20, 2002, Plaintiff participated in an EMG and nerve conduction study of her left and right upper extremities the results of which were "not suggestive of a cervical radiculopathy, brachial plexopathy, ulnar neuropathy, [or] radial or medial neuropathy." (Tr. 285-89).

On February 28, 2003, Plaintiff rated her neck pain as "3/10." (Tr. 247). On April 3, 2003, Plaintiff reported that "currently her pain is level 2/3." (Tr. 244). On May 28, 2003, Plaintiff reported that she was taking Vicodin only "about" twice weekly and was instead performing isometric relaxation exercises and using Advil and Tylenol. (Tr. 238).

Treatment notes dated June 19, 2003, indicate that Plaintiff had returned to work as a bus driver.  (Tr. 237).  On July 11, 2003, Plaintiff reported that "once again [she] has started to have increasing neck pain" which she rated as 10/10.  (Tr. 234).  Dr. Visser concluded that Plaintiff was unable to work as a bus driver and, therefore, "t[ook] her off work."  (Tr. 234).  Treatment notes dated September 12, 2003, indicate that Plaintiff's pain level was "3/10."  (Tr. 227).

On October 20, 2003, Plaintiff participated in a physical capacity evaluation conducted by Dr. Bryan Visser.  (Tr. 213-17).  Plaintiff "appeared to move through the testing with a moderate effort level despite coaching to do things as maximally as possible."  (Tr. 216).  The results of this evaluation revealed that Plaintiff "has no restrictions on sitting or standing" and "no restrictions regarding her ability to walk or climb."  (Tr. 217).  The doctor reported that Plaintiff "is able to lift a maximum of 50 pounds on a rare basis and generally should not lift more than 10 pounds on a frequent basis."  (Tr. 217).  The doctor also reported that Plaintiff "can carry 20 pounds" and "has no restrictions in regards to gripping and pinching."  (Tr. 217).  Dr. Visser concluded that Plaintiff "should avoid working with her head in a flexed position on greater than an occasional basis and working over her shoulder should only be on an occasional basis or less."  (Tr. 217).

On October 31, 2003, Plaintiff was examined by Dr. Visser.  (Tr. 284).  Plaintiff reported that she was experiencing "problems with headaches."  (Tr. 284).  The results of a manual muscle test were "normal" and Spurling's sign[1] was "negative."  (Tr. 284).  The doctor diagnosed Plaintiff with "myofascial pain syndrome-stable" and "muscular tension headaches."  (Tr. 284).

---

[1]  A positive Spurling's test suggests the presence of a cervical nerve root disorder.  Thomas W. Woodward, M.D., and Thomas M. Best, M.D., Ph.D., *The Painful Shoulder: Part I Clinical Evaluation*, American Family Physician, May 15, 2000, *available at*, http://www.aafp.org/afp/20000515/3079.html (last visited March 19, 2012).

Plaintiff's medication regimen was modified.  (Tr. 284).  On December 17, 2003, Plaintiff reported that her medication "helps reduce her headaches," but that she was still experiencing neck pain.  (Tr. 283).

On June 18, 2004, Plaintiff was examined by Dr. Visser.  (Tr. 282).  Plaintiff reported that she "has been working since early January" and "has increased neck pain from driving the bus, due to the constant turning and looking over the wheel."  (Tr. 282).  The results of a manual muscle test were "normal" and Spurling's sign and Adson's maneuver[2] were both "negative."  (Tr. 282).  The doctor concluded that Plaintiff "not return to work as a bus driver due to the fact that she had previously failed a number of attempts to return to bus driving."  (Tr. 282).

On June 22, 2004, Plaintiff participated in an MRI examination of her cervical spine the results of which revealed "moderate stenosis, mild cord impingement at C5-6," but "no interval change from [November 8, 2002]."  (Tr. 280).

On August 19, 2004, Plaintiff was examined by Dr. Visser.  (Tr. 222).  Plaintiff reported that she has been off work for more than three weeks and that "things are going well."  (Tr. 222).  Plaintiff reported that she was taking Vicodin "just at nighttime" and that her pain was 4/10.  (Tr. 222).  On November 18, 2004, Dr. Nehdia Hashemi reported that Plaintiff "is not allowed to drive a bus," but "can be employed for other jobs."  (Tr. 298).  On November 19, 2004, Dr. Visser authored a letter in which he stated the following:

> I have cared for Ms. Jackson for a number of months.  She was being treated for myofascial pain syndrome of the right levator scapula muscle.  She responded to conservative treatment so that she was able to return to work as a bus driver.  While driving a bus, she had a recurrence of her symptoms.  She was taken off bus driving and

---

[2]   Adson's test is employed to determine the presence of thoracic outlet syndrome.  J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* A-115 (Matthew Bender) (1996).

allowed time for treatment to resolve her pain.  Subsequently, this same cycle occurred two additional times.  The last time I saw her she was told that either she needs to be working in a different type of job or put up with the pain.  Last time she returned to work, I told her that she should not come back to see me if she had a return of her symptoms and was seeking a work excuse.  She was told that she needs to be looking for a job in which she works with her hands closer to her trunk, as well as avoiding prolonged head flexing.

(Tr. 221).

On February 15, 2005, Plaintiff participated in a consultive examination conducted by Erin Campbell-Brooks, limited license psychologist.  (Tr. 327-31).  Plaintiff reported that she was disabled "due to depression."  (Tr. 327).  Plaintiff reported that she last worked as a bus driver in June 2004, but was no longer able to perform that job.  (Tr. 328).  Plaintiff reported that she was "depressed" and "mad" because "the accident wasn't even my fault and I'm the one who got the bad end of the stick."  (Tr. 329).  Plaintiff appeared "very depressed," but otherwise the results of a mental capacity examination were unremarkable.  (Tr. 329-30).  Plaintiff was diagnosed with major depression, recurrent, severe without psychotic features.  (Tr. 331).

On August 10, 2005, Plaintiff was examined by Dr. Yuya Hagiwara.  (Tr. 418).  Plaintiff reported that she "has been doing well" and "has not been to physical therapy these past two weeks."  (Tr. 418).  Plaintiff reported that she "has been much more active, able to do house chores" and "is currently going outside more often."  (Tr. 418).  The doctor observed that Plaintiff was on a "treatment plan including therapeutic exercise, manual therapy techniques, soft tissue mobilization and therapeutic exercise home program."  (Tr. 418).  The doctor reduced Plaintiff's pain medication regimen and also observed that Plaintiff's "depression status seems to be improving."  (Tr. 418).

On September 1, 2005, Plaintiff attempted to obtain a refill of her narcotic pain

medication.  (Tr. 415).  Plaintiff was requesting additional pain medication because she had been

taking twice as much pain medication as was prescribed.  (Tr. 415).  Plaintiff was informed that her

prescription could not be refilled because "this will be against [her] pain contract."  (Tr. 415).  The

following day, Plaintiff was examined by Dr. Hagiwara.  (Tr. 413).  The doctor reported that

Plaintiff "has been doing well" and that "her depression has been controlled with the use of Lexapro

along with counseling."  (Tr. 413).  The doctor also reported that "we were successful in starting to

wean her narcotic use."  (Tr. 413).

On September 26, 2005, Plaintiff attempted to obtain a refill of her narcotic pain

medication.  (Tr. 412).  Plaintiff reported that her medication was lost in a house fire.  (Tr. 412).

Plaintiff's request was denied pursuant to the terms of her pain management contract.  (Tr. 412).

On November 21, 2005, Plaintiff was examined by Dr. Promil Vhutani.  (Tr. 411).

An examination of Plaintiff's upper extremities revealed 5/5 muscle strength and "intact" range of

motion.  (Tr. 411).  Plaintiff exhibited tenderness to palpation "on the posterior aspect of [the] right

shoulder and upper thoracic paraspinal area," but "no tenderness to palpation over the spine."  (Tr.

411).  Plaintiff was instructed to use Motrin and decrease her use of narcotic pain medication.  (Tr.

411).

On March 16, 2006, Dr. Hagiwara modified Plaintiff's pain medication regimen.  (Tr.

402).  On March 31, 2006, Plaintiff reported that her new medication regimen "has been effective

and has been controlling her pain well."  (Tr. 400).  On June 5, 2006, Plaintiff rated her pain as 4/10.

(Tr. 398).

On September 12, 2006, Plaintiff contacted Dr. Hagiwara and reported that she was

"addicted to the pain medications" and was seeking a referral for placement in a detox unit.  (Tr.

392).

On October 3, 2006, Plaintiff reported that she "recently stopped taking" her prescribed Zoloft after which "her depression status has been declining." (Tr. 386). Plaintiff was prescribed Prozac and instructed to meet with a counselor. (Tr. 387). Treatment notes dated October 17, 2006, indicate that Plaintiff's "mood is somewhat improved." (Tr. 382). On November 20, 2006, Plaintiff reported that she was experiencing "improved mood" and "is sleeping better." (Tr. 378). Plaintiff also reported that "her activity level has improved" and she "is able to do most of the house chores including cooking and laundry." (Tr. 378).

On March 28, 2007, Plaintiff reported that "she does not have any pain." (Tr. 502). On April 10, 2007, Plaintiff reported that "her mood swings have been better on the Cymbalta." (Tr. 503). Plaintiff also reported that she "is more accepting [of] her current condition more than previously." (Tr. 503).

Treatment notes dated June 21, 2007, indicate that Plaintiff was experiencing "chronic pain with opioid dependence." (Tr. 508). Treatment notes dated July 24, 2007, reiterated that Plaintiff was experiencing "narcotic dependence." (Tr. 516).

On September 20, 2007, Plaintiff was examined by Dr. Ramona Tan. (Tr. 523-24). Plaintiff reported that "she feels a lot better in terms of her depression" and "is smiling more and feels better." (Tr. 523). Dr. Tan observed that Plaintiff "looks a lot better." (Tr. 523). Plaintiff was diagnosed with the following: (1) major depressive disorder, improving; (2) recurrent dysthymia; (3) generalized anxiety disorder; (4) mood disorder secondary to opioid dependence; (5) chronic

pain disorder; and (6) history of panic attacks.  (Tr. 523).  Plaintiff's GAF score was rated as 55.[3]
(Tr. 524).

On February 18, 2008, Plaintiff participated in an MRI of her cervical spine the
results of which revealed: (1) "a focal area of low signal intensity...from the lower half of C5 to the
upper half of C6 " and (2) "minimal" disk bulging at C4-5 and C5-6 with "no central canal or neural
foraminal narrowing."  (Tr. 571).  The results of an MRI of Plaintiff's thoracic spine, performed the
same day, were "normal."  (Tr. 572).

On June 26, 2008, Plaintiff was examined by Dr. Robert Baker.  (Tr. 609-10).
Plaintiff reported that "medication gives her 90% relief" and that her pain level was presently 4/10.
(Tr. 609).  An examination of Plaintiff's neck revealed "mild" tenderness but "no deformity."  (Tr.
609).  An examination of Plaintiff's upper extremities revealed "good movement" with "intact
pulses."  (Tr. 609).  Thoracic outlet testing was negative and Allen's test [4] was also negative.  (Tr.
609).  Plaintiff also exhibited 5/5 strength in her hands, wrists, elbows, and shoulders.  (Tr. 609).
Plaintiff exhibited "mildly limited" range of neck motion and Spurling's test was negative.  (Tr.
610).  Plaintiff "admitted to previous addiction to narcotics."  (Tr. 609).  Plaintiff reported that she
had been "working for a brief period of time" with another doctor regarding this issue, but that she
"is not interested in following through on that."  (Tr. 609).  Dr. Baker recommended to Plaintiff that
she treat her symptoms with a combination of a muscle relaxant and antidepressant, but Plaintiff
responded that "she was not interested in taking those medications."  (Tr. 610).  Dr. Baker concluded

---

[3]   The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of
functioning.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV).
A GAF score of 55 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning."  DSM-IV at 34.

[4]   Allen's test is designed to determine occlusion or blockage of the ulnar or radial artery.  J.E. Schmidt, *Schmidt's Attorneys'
Dictionary of Medicine* A-164 (Matthew Bender) (1996).

that Plaintiff "was not experiencing any obvious neurologic deficit." (Tr. 610). The doctor instructed Plaintiff to "keep active." (Tr. 610).

On July 29, 2008, Plaintiff participated in a neurosurgical consultation conducted by Dr. Mark Meyer. (Tr. 573-76). The results of a neurological examination were "normal." (Tr. 575-76). On September 26, 2008, Plaintiff reported that "her anxiety is doing well with the Xanax." (Tr. 634).

At the February 5, 2009 Administrative Hearing, Plaintiff testified that "a couple times a week" the pain in her neck and shoulders rates as 10/10. (Tr. 731). When asked by the ALJ whether she was "in pain right now," Plaintiff responded "I'm in a little pain right now." (Tr. 734). Plaintiff further indicated that she last took pain medication the previous night. (Tr. 734). With respect to her depression, Plaintiff testified that she simply stays in bed "almost every day" and that "it's a struggle to get up and do simple things." (Tr. 736).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[5] If the Commissioner can make a

---

[5] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors

dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).   The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity.  *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy.  *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.  While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from C5-6 stenosis and depression, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 21-28).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform light work[6] subject to the following limitations: (1) she can

including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

[6]  Light work involves lifting "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567.  Furthermore, work is considered "light" when it involves "a good deal of walking or standing," defined as "approximately 6 hours of an 8-hour workday."  20 C.F.R. § 404.1567; Titles II and XVI: Determining Capability to do Other Work - the Medical-Vocational Rules of Appendix 2, SSR 83-10, 1983 WL 31251 at *6 (S.S.A. 1983); *Van Winkle v. Commissioner of Social Security*, 29

only occasionally climb, balance, stoop, crouch, kneel, or crawl; (2) she can perform only simple, routine, and repetitive tasks.  (Tr. 28).  The ALJ, based on testimony from a vocational expert, found that Plaintiff retained the ability to perform her past relevant work as a production assembler.  (Tr. 32).  The ALJ also found, in the alternative, that there existed a significant number of other jobs that Plaintiff could perform consistent with her limitations.  (Tr. 32).  Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

a.       The ALJ Properly Evaluated Plaintiff's Impairments

Plaintiff argues that she is entitled to relief because the ALJ failed to find that she suffered from myofascial pain syndrome.  At step two of the sequential disability analysis articulated above, the ALJ must determine whether the claimant suffers from a severe impairment.  The Sixth Circuit has held that where the ALJ finds the presence of a severe impairment at step two and proceeds to continue through the remaining steps of the analysis, the alleged failure to identify as severe some other impairment constitutes harmless error so long as the ALJ considered the entire medical record in rendering his decision.  *See Maziarz v. Sec'y of Health and Human Services*, 837 F.2d 240, 244 (6th Cir. 1987); *Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir., Feb. 22, 2008) (citing *Maziarz*, 837 F.2d at 244); *Fisk v. Astrue*, 253 Fed. Appx. 580, 583-84 (6th Cir., Nov. 9, 2007) (same).

Here, the ALJ determined that Plaintiff suffered from a severe impairment at step two of the sequential analysis and continued with the remaining steps thereof, considering in detail the medical evidence of record.  Thus, even if the Court assumes that the ALJ erred in failing to find that

Fed. Appx. 353, 357 (6th Cir., Feb. 6, 2002).

Plaintiff suffered from myofascial pain syndrome, such does not call into question the substantiality of the evidence supporting the ALJ's decision.  *See Heston v. Commissioner of Social Security*, 245 F.3d 528, 535-36 (6th Cir. 2001) (recognizing that remand to correct an error committed by the ALJ unnecessary where such error was harmless); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("no principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"); *Berryhill v. Shalala*, 1993 WL 361792 at *7 (6th Cir., Sep. 16, 1993) ("the court will remand the case to the agency for further consideration only if 'the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture...'").

### b.    The ALJ Properly Evaluated the Medical Evidence

Plaintiff asserts that the ALJ failed to accord controlling weight to opinions expressed by three of her treating physicians.  The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition.  *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'"  *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data."  *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at

*2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)).  The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence.  *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so.  *Wilson*, 378 F.3d at 544.  In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors.  *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544.  The ALJ is not required, however, to explicitly discuss each of these factors.  *See, e.g.*, *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).  Instead, the record must reflect that the ALJ considered those factors relevant to his assessment.  *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

1.     Dr. Niaz Mohammad

On December 18, 2007, Dr. Mohammad completed a report regarding Plaintiff's mental impairments.  (Tr. 564-69).  The doctor assessed Plaintiff's abilities over a wide range of domains of functioning.  The doctor reported that with respect to the following areas, Plaintiff was

"unable to meet competitive standards" in "a regular work setting": (1) maintain attention for a two hour segment; (2) accept instructions and respond appropriately to criticism from supervisors; (3) understand, remember, and carry out detailed instructions; and (4) interact appropriately with the general public. (Tr. 566-67). Dr. Mohammad further reported that in the following areas, Plaintiff possessed "no useful ability to function": (1) complete a normal workday and workweek without interruptions from psychologically based symptoms; (2) perform at a consistent pace without an unreasonable number and length of rest periods; and (3) deal with stress of semiskilled and skilled work. (Tr. 566).

The ALJ concluded that Dr. Mohammad's opinion was not entitled to "great weight" for two reasons. First, as the ALJ noted, Dr. Mohammad had not treated Plaintiff for a long enough period of time to develop the insight necessary for his opinion to be entitled to great weight. As Plaintiff concedes, she met with Dr. Mohammad on only four occasions over a two month period. The length of the relationship between a claimant and a treating physician and the frequency of examinations are valid considerations when assessing the weight to be accorded to the opinion of a treating physician. *See Kornecky v. Commissioner of Social Security*, 167 Fed. Appx. 496, 506-07 (6th Cir. 2006); 20 C.F.R. § 404.1527(d)(2)(I).

More importantly, as the ALJ further observed, the medical evidence, including the doctor's contemporaneous treatment notes, do not support the extreme limitations identified above. As detailed above, the medical evidence reveals that when Plaintiff takes her medication as prescribed, she is able to function at a level consistent with the ALJ's RFC determination. The Court, therefore, discerns no error in the ALJ's decision to afford less than controlling weight to Dr. Mohammad's opinion.

16

2.    Dr. Michael Liepman

On October 19, 2007, Dr. Liepman provided a statement in response to questions posed by Plaintiff's attorney. (Tr. 534-38). Dr. Liepman stated that he had met with Plaintiff on only two occasions. (Tr. 534). The doctor reported that Plaintiff suffered from a "pain disorder with psychological and physical components." (Tr. 535). Dr. Liepman stated that Plaintiff "complains of an inability to perform normal activities of daily living. . .[which] suggests that she would not be able to get to work and stay at work for eight hours a day no matter what the work was." (Tr. 537).

The ALJ declined to accord controlling weigh to Dr. Liepman's opinion on the ground that it was inconsistent with the medical evidence of record. (Tr. 25-26). Also, rather than articulate specific restrictions or limitations from which Plaintiff suffered, the doctor simply declared that Plaintiff was unable to work. Opinions that a claimant is disabled, however, are entitled to no deference because the determination of disability is a matter left to the commissioner. *See* 20 C.F.R. § 404.1527(e)(1).

Moreover, as Dr. Liepman conceded, his opinion was based on the "short contact" he had with Plaintiff and the treatment notes of others, rather than his own observations and findings. (Tr. 537). Such is hardly the basis for an opinion entitled to controlling weight. As described above, the length of the relationship between a claimant and a treating physician and the frequency of examinations are valid considerations when assessing the weight to be accorded to the opinion of a treating physician. Finally, as the ALJ observed, the evidence of record simply fails to support the doctor's opinion that Plaintiff is incapable of working. As the evidence makes clear, while Plaintiff is not able to resume driving a bus when she takes her medication as prescribed she is capable of performing work activities consistent with her RFC. Accordingly, the Court finds no

17

error in the ALJ's decision to afford less than controlling weight to Dr. Liepman's opinion.

3.      Dr. Hagiwara

On May 22, 2007, Dr. Hagiwara provided a statement in response to questions posed by Plaintiff's attorney.  (Tr. 461-66).  The doctor stated that he "would not recommend [Plaintiff] going back to work, especially as a bus driver."  (Tr. 461).  The doctor also stated that Plaintiff was unable "to do any full time work."  (Tr. 464).  The ALJ rejected Dr. Hagiwara's opinion because it was not supported by objective findings and was inconsistent with the evidence of record.

Again, instead of articulating specific restrictions or limitations from which Plaintiff suffered, the doctor simply declared that Plaintiff was unable to work.  As previously noted, such opinions are not entitled to any deference because the determination of disability is a matter left to the commissioner.  Furthermore, as detailed above, Dr. Hagiwara's opinion is contradicted by the evidence of record including the doctor's own treatment notes.  The Court finds no error in the ALJ's decision to accord less than controlling weight to Dr. Hagiwara's opinion.

c.      The ALJ Properly Discounted Plaintiff's Subjective Allegations

As described above, Plaintiff testified at the Administrative Hearing that she was impaired to an extent far beyond that recognized by the ALJ.  Plaintiff argues that the ALJ erred in discounting her subjective allegations of pain and limitation.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability."  *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added); *see also*, *Grecol v. Halter*, 46 Fed. Appx. 773, 775 (6th Cir., Aug. 29,

18

2002) (same).  As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled."  20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)) *Hash v. Commissioner of Social Security*, 309 Fed. Appx. 981, 989 (6th Cir., Feb. 10, 2009).  Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted).  This standard is often referred to as the *Duncan* standard.  *See Workman v. Commissioner of Social Security*, 105 Fed. Appx. 794, 801 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms."  *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)).  However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record."  *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference."  *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t

is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony").  It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand.  The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded.  *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

The ALJ discounted Plaintiff's subjective allegations as such were inconsistent with the medical record and her reported activities.  (Tr. 29-32).  As detailed above, this determination is amply supported by the record.  Again, the evidence of record clearly indicates that when Plaintiff takes her medication and follows her care providers' instructions she is capable of performing work consistent with her RFC.  In sum, the ALJ's decision to afford less than controlling weight to Plaintiff's subjective allegations is supported by substantial evidence.  *See Norris v. Commissioner of Social Security*, 2012 WL 372986 at *4-5 (6th Cir., Feb. 7, 2012) (where the ALJ "did not misconstrue facts in the record or overlook other significant evidence. . .and identified specific facts supported by the record" which to "a reasonable mind" would "cast doubt on" a claimant's subjective allegations, the ALJ's decision to discount the claimant's credibility is not in error).

d.    The ALJ Properly Relied on the Vocational Expert's Testimony

Finally, Plaintiff asserts that the ALJ relied upon the response to an inaccurate hypothetical question.  While the ALJ may satisfy his burden through the use of hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments.  *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150

(6th Cir. 1996).

   The hypothetical question which the ALJ posed to the vocational expert simply asked whether there existed jobs which an individual could perform consistent with Plaintiff's RFC.  In response, the vocational expert testified that Plaintiff would be able to perform her past relevant work as a production assembler.  (Tr. 749-57).  The vocational expert further testified that even if Plaintiff was unable to perform her past relevant work, there existed a significant number of other jobs which Plaintiff could perform consistent with her RFC.  (Tr. 749, 757-58).  The ALJ's RFC determination is supported by substantial evidence and there was nothing improper or incomplete about the hypothetical questions the ALJ posed to the vocational expert.  The Court concludes, therefore, that the ALJ properly relied upon the vocational expert's testimony.

## CONCLUSION

   For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence.  Accordingly, the Commissioner's decision is **affirmed**.  A judgment consistent with this opinion will enter.


Date:  March 26, 2012         /s/ Ellen S. Carmody
              ELLEN S. CARMODY
              United States Magistrate Judge